UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CY M. ABDEL,<br><br>　　　　Plaintiff(s),<br><br>　　v.<br><br>IKON OFFICE SOLUTIONS, INC.,<br>　　　　Defendant(s). | Case No. C-05-1685 JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Docket No. 38]** |

## I.    INTRODUCTION

On Friday, August 11, 2006, at 1:30 p.m., Defendant's Motion for Partial Summary Judgment ("the Motion") came on for hearing. For the reasons stated below, the Motion is GRANTED in part and DENIED in part.

## II.   BACKGROUND

### A.    Facts[1]

Plaintiff's employment with Defendant IKON Office Solutions ("IKON") began on March 20, 1995. Plaintiff's Declaration in Opposition to IKON's Motion for Summary Judgment ("Abdel Decl."), ¶ 2. In 2004, Abdel held the position of Major Account Representative in the San Francisco area. *Id*.; *see also* Declaration of Curt Albrecht in Support of Defendant IKON Office Solutions, Inc.'s Motion for Partial Summary Judgment ("Albrecht Decl."), ¶ 2. He alleges – and IKON concedes - that he was a "star performer" in his office. *Id*.; Motion at 2 (conceding that Abdel was "one of IKON's top producing and highest paid sales representatives in IKON's Westbay Marketplace").

---

[1] Unless otherwise indicated, the Court relies on facts that it finds to be undisputed.

On August 12, 2004, Abdel was terminated. Abdel Decl., ¶ 3. The decision to terminate Abdel was made by Curt Albrecht, who at that time was Vice President of the Westbay Marketplace at IKON. Albrecht Decl., ¶ 1. Albrecht based his decision on the recommendation of Crisi Dominguez, a Human Resources Senior Generalist at IKON. *Id.,* ¶ 5. Dominguez, in turn, made her recommendation after conducting an investigation of Abdel relating to suspected alteration of a document. Declaration of Robin E. Weideman in Support of Defendant IKON Office Solutions, Inc.'s Motion for Partial Summary Judgment ("Weideman Decl."), Ex. C (Deposition of Curt Albrecht ("Albrecht Depo.")) at 106.

According to Albrecht, he terminated Abdel for the sole reason that he was found to have altered a document, in violation of IKON's Code of Ethics. Albrecht Decl., ¶ 5. Abdel, however, asserts that his termination was, instead, retaliation for earlier complaints that he had made to Albrecht and Vice President Scott Payne, as well as to the State Labor Commission, concerning various practices by IKON that Plaintiff believed to be illegal. *Id*. at ¶ 35.

### 1. Abdel's Complaints About IKON Practices

According to Abdel, between 2002 and July 2004, he complained to Albrecht and to another Vice President, Scott Payne, about a variety of practices by IKON that he believed to be illegal. Abdel Decl., ¶ 16. Specifically, he states that he complained about the following conduct: 1) double billing of Abdel's customers, including the Transnational account, despite Abdel's complaints to management, including Albrecht, about the practice; 2) billing of customers, including the Joe Boxer account, for services that had not been rendered, despite Abdel's complaints to management, including Albrecht, about the practice; 3) forging of Abdel's signature on some of his time sheets by his immediate supervisor, Jim Fuller, which allegedly resulted in loss of vacation pay and wages, despite Abdel's complaints to management; 4) forging of customer signatures on order documents by individual's in IKON's Hawaii office, including Jimmy Osaka and Thai Thuei, despite complaints by Abdel to management, including Albrecht and Payne; 5) failure to pay wages and commissions when due and owing. *Id*.

With respect to IKON's alleged failure to pay wages and commissions, Abdel states that he and another employee, Cory Harrison, "led a campaign of IKON employees in our office who also

were not paid their wages and commissions on time." *Id.*, ¶ 16. Abdel describes the campaign as follows:

> This campaign raged throughout 2004 and involved more than a half dozen IKON employees who filed claims with the State Labor Commission concerning IKON's failure to pay wages and commissions when due. Virtually every IKON employee won their case against IKON. Cory and I helped these employees to prepare and file their claims with the State Labor Commission.

*Id.* According to Abdel, all of the employees who filed complaints with the State Labor Commission for failure to pay wages and commissions, including Abdel and Harrison, subsequently were terminated by IKON. *Id.*, ¶ 21; *see also* Plaintiff's Statement of Disputed Facts and Undisputed Facts in Opposition to Motion for Summary Judgment ("Plaintiff's Disputed Facts"), Ex. D (Deposition of Cory Harrison ("Harrison Depo.")) at 86 (testifying that IKON "blacklisted" employees who went to the Labor Commission).

Abdel also states that in response to his complaints, Vice President Payne[2] "repeatedly warned [him] that the conduct [Abdel] was complaining of about IKON was extremely explosive" and that if Abdel did not "stop complaining to the Labor Commissioner . . . IKON would fire [Abdel] to shut [him] up." Abdel Decl., ¶18. Payne, in turn, testified that he received a "tremendous amount of phone calls" from Abdel in which Abdel made "very substantial claims about certain accounting procedures that were going on at IKON in San Francisco." Disputed Facts, Ex. B (Deposition of Scott Payne ("Payne Depo.")) at 22-23. According to Payne, he reminded Abdel that "California is an at will firing state . . . and you can be fired for any reasons whatsoever, so you better basically either – if you want to do something with the information, you'd better do something with it or shut up, or you'll find yourself not working there anymore . . . ." *Id.* at 26.

---

[2] Payne had worked as Abdel's office manager in San Francisco between December 1997 and March 2001. Disputed Facts, Ex. B (Payne Depo.) at 13. After Payne was promoted to IKON's Central Valley office, in March 2001, he had no supervisory authority over Abdel but Abdel continued to call Payne to discuss "what was going on in the west bay marketplace." *Id.* at 15, 22-23.

3

### 2. Suspected Forging of Signatures by Abdel

According to IKON, Abdel was suspected of forging signatures on IKON documents on two occasions in 2004. Motion at 2. First, IKON points to testimony by Albrecht that five or six weeks before the events that led to Abdel's termination, a customer named Columbia Trust complained to IKON that it had not signed a particular document and that the signature on the document was a forgery. Weideman Decl., Ex. C (Albrecht Depo.) at 21. According to Albrecht, an investigation was conducted by Human Resources specialist Crisi Dominguez, but it could not be proven that Abdel had forged the signature. *Id*. As a result, no disciplinary action was taken. *Id*.

Abdel asserts that Albrecht's testimony is incorrect. Abdel Decl., ¶ 4. According to Abdel, he was accused of forging a signature on a Columbia Trust document in 2002, not 2004, and received an apology when it was proved that the accusation was false. *Id*.

Second, Abdel received a written warning from his supervisor, Jim Fuller on April 5, 2004. Weideman Decl., Ex. D (Deposition of Crisi Dominguez (Domiguez Depo.)), Ex. 9. This document, entitled "First and Final Written Warning" listed numerous alleged deficiencies relating to Abdel's work. *Id*. Among these is the following statement:

> There is some question as to how Steve Slawson's signature appeared on NASD and WO documents, when he had never seen them. You are hereby alerted that you are not empowered to sign Steve's name, or any other name, to any such document in the future.

*Id*. At the conclusion, Fuller writes, "Cy, while allowing for the diversity you bring to the team, I am done tolerating your consitent [sic] voicing of negativity relative to IKON. While certainly no company is perfect and we have engineered many changes, I expect a sales professional with integrity to find the positive prior to expressing the negative . . . ." *Id*.

Abdel denies forging IKON employee Steve Slawson's signature, and points to testimony by order coordinator Therese Demers and sales representative Cory Harrison that on several occasions Jim Fuller forged Slawson's signature on NASD and WO forms when Slawson was unavailable and his signature was needed to complete paperwork. Plaintiff's Disputed Facts, Ex. C (Deposition of Therese Demers ("Demers Depo.")) at 50; Ex. D (Harrison Depo.) at 25-26.

### 3.     Alleged Forging of Documents by Other Employees

In addition to the testimony cited above that Fuller forged the signature of Steve Slawson, Abdel states in his declaration that Jim Fuller forged Abdel's signature on time sheets. Abdel Decl., ¶ 16. According to Abdel, he complained to management about the forged signatures and Fuller admitted to forging the signatures, but Fuller was not disciplined. *Id.* Similarly, Harrison testified that Fuller forged Harrison's signature on several time sheets and admitted to Harrison that he had done so. Disputed Facts, Ex. D (Harrison Depo.) at 17-18. According to Harrison, these forged signatures on his time sheets were a subject of one of his complaints to the Labor Commission. *Id.*

Abdel also states that he complained to IKON management, including Albrecht, that IKON employees in the Hawaii office were forging signatures on customer order documents but that no action was taken to stop these practices. Abdel Decl., ¶ 4. Harrison also testified about forged signatures from the Hawaii office. According to Harrison, on one occasion he was standing at the printer when five orders came in from the Hawaii office, supposedly signed by five different customers but all signed in the same handwriting. Disputed Facts, Ex. D (Harrison Depo.) at 33; *see also id.* at 16 (testifying that Harrison referred in conversation with Albrecht to practice of forging of documents in Hawaii office to increase bonuses).

### 4.     The "Doctored" MARP

According to IKON, Abdel was fired because it was believed he altered a document called a MARP. Albrecht Decl., ¶ 2. A MARP is a document used in some deals that "allows a sales representative to use a certain lease rate based on a customer's commitment to provide a specified amount of business to IKON." *Id.* Generally, the MARP was issued to the sales representative via e-mail by Marc Lera, an employee of General Electric, which finances IKON's deals. Abdel Decl., ¶ 13.

At IKON, when a Major Account Representative enters into a deal with a customer to sell IKON goods and services, he is required to submit certain deal paperwork to IKON's order processing department. Albrecht Decl., ¶ 3. An order coordinator (O/C) processes the deal by making sure all the required paperwork and necessary signatures are included. *Id.* The paperwork is

then passed on to another employee to audit the deal and again check that the necessary paperwork and signatures are included. *Id*.

According to IKON, the altered MARP that led to Abdel's termination was found by IKON employee Yesenia Martinez in an order package for one of Abdel's deals, involving a customer called Tuscan Inn. Weideman Decl., Ex. B (Deposition of Yesenia Martinez ("Martinez Decl.")) at 46. Martinez testified that on August 3, 2004, she conducted an audit of the paperwork for the Tuscan Inn deal, which had already been reviewed by Abdel's O/C, Therese Demers. *Id*. at 38. She found deficiencies in the paperwork, including the fact that the MARP was missing, and therefore returned the package to O/C Demers with instructions to fix these problems. *Id*. at 43-44. Later that day, Martinez testified, she found the package in her in-box, apparently placed there by Demers to be re-audited. *Id*. at 46. When she audited the package for the second time, she found a MARP that had not been in the package the first time. *Id*. The MARP was for an entity called Kimpton Hotel and Restaurant Group LLC, of which Tuscan Inn is a subsidiary. *Id* at 47 & Ex. 4. The MARP was in the form of an e-mail message from Marc Lera to Abdel and reflected an expiration date of 9/30/04. *Id*. According to Martinez, she questioned whether the Tuscan Inn had been added to the Kimpton MARP and therefore called Marc Lera to check. *Id*. at 47. Lera pulled up the MARP in his e-mail and found that it expired on 6/30/04 and told Martinez that the hard copy of the MARP included in the Tuscan Inn package must have been altered. *Id*. at 50. According to Martinez, Lera advised her to notify her manager of the altered MARP, which she did. *Id*. at 13-14.

Abdel disputes Martinez's account. Abdel Decl., ¶¶ 29-31. According to Abdel, when he gave the deal package for Tuscan Inn to O/C Demers, on August 3, 2004, he did not include a MARP because he had just requested a MARP for Tuscan Inn from Marc Lera that day. Abdel Decl., ¶¶ 23, 29 & Ex. 2 (e-mail from Cy Abdel to Mark Lera dated August 3, 2004 requesting MARP for Tuscan Inn). Abdel points out that two days later, on August 5, Lera e-mailed the Tuscan Inn MARP to Abdel. *Id*., ¶ 24 & Ex. 3 (e-mail from Mark Lera to Cy Abdel with MARP for Tuscan Inn). He states the he "never 'doctored' or 'altered' the MARP that Martinez 'discovered' on August 3, 2004." *Id*., ¶ 31. He further states that he had never seen the altered document until it was shown to him by Crisi Dominguez as part of her investigation. *Id*.

Abdel instead points to evidence suggesting that Martinez herself may have altered the MARP. According to Abdel, Martinez had an "acid dislike" of him. Abdel Decl., ¶ 27. Abdel states that when Martinez was assigned to him as his O/C, she refused to process orders without being given bribes and that he complained "vigorously" about this to Martinez's manager, Greg Walston. *Id*., ¶ 26; *see also* Plaintiff's Disputed Facts, Ex. D (Harrison Depo.) at 73 (testimony that Harrison complained to Albrecht about Martinez's practice of demanding payment from sales representatives to process their orders and Albrecht did nothing). On one occasion, Abdel states, he "had to give Martinez a gift certificate for $300.00 to Banana Republic for processing an order." Abdel Decl., ¶ 27 & Ex. 5. As a result of these complaints, Abdel was reassigned to O/C Demers, but Martinez continued to audit his deals. *Id*. According to Abdel, Martinez told him she would "get even" with him. *Id*.

Abdel's new O/C, Therese Demers, describes Martinez's relation ship with Abdel in similar terms. She testified as follows:

> . . . Yesenia didn't like him. I knew for a fact that she didn't like him because she would always complain to me about him. And he got her in trouble, just recently right before this whole thing happened. She would always tell me what an asshole he is, not to do any favors. And she said, Oh you know, he makes all this money and he doesn't even give you anything for it. . . . She couldn't stand him and that's why I became his O/C.

Plaintiff's Disputed Facts, Ex. C (Demers Depo.) at 25. Demers further testified that she was "dead sure" Martinez herself altered the MARP because she "couldn't stand" Abdel. *Id*. at 29-30. Demers noted that it would be "easy" to change the MARP on the system. *Id*. at 30. She also questioned Martinez's motives in notifying Human Resources of the discrepancy without first asking Demers about the MARP. *Id*.

### 5. The Investigation

Martinez's manager, Greg Walston, notified Human Resources specialist Crisi Dominguez, of the altered document on August 5, 2004. Declaration of Crisi Fromherz in Support of Defendant IKON Office Solutions, Inc.'s Motion for Partial Summary Judgment ("Fromherz Decl."),[3] ¶ 9.

---

[3] Crisi Dominguez is Crisi Fromherz's maiden name. Because IKON employees knew and referred to her as Crisi Dominguez, the Court does the same.

7

Dominguez, in turn, spoke with Albrecht, informing him that it was her intention to conduct an investigation of the altered MARP. *Id*. Albrecht had also spoken to Marc Lera, who had shown him a copy of his original MARP and the altered MARP. Albrecht Decl., ¶ 4. Albrecht told Dominguez to do whatever she "needed to do." Fromherz Decl., ¶ 10.

Dominguez conducted her investigation from August 6 through August 10, 2004. *Id*., ¶ 12. According to Dominguez, during the course of her investigation, she interviewed Marc Lera, Cy Abdel, Therese Demers, Yesenia Martinez, and Greg Rudy. *Id*., ¶ 13. Jim Fuller, who was replaced as Abdel's supervisor in late July or early August of 2004 by Art Aronson, was not involved in the investigation or the decision to terminate Abdel. *Id*., ¶ 27. She also notified Steve Bottini, Director of Sales, that she was conducting an investigation. *Id*., ¶ 11. Bottini told her that he might have authorized Abdel to change the MARP. *Id*.

On August 9, 2004, Dominguez interviewed Abdel. *Id*., ¶ 15. Art Aronson was also present. *Id*. Dominguez testified that going into the meeting, she believed that Abdel might have been authorized by Steve Bottini to alter the expiration date on the MARP, but that Abdel immediately denied having altered the MARP or having spoken to Steve Bottini about it. Weideman Decl., Ex. D (Dominguez Depo.) at 80-81. According to Dominguez, after initially denying having altered the MARP, Abdel began to answer more evasively. Fromherz Decl., ¶ 15. She states that when she and Aronson explained why they believed Abdel altered the MARP, he answered, "it's a tough question." *Id*. According to Dominguez, he also said, "I'm not sure if I did it because I didn't need it," explaining that because the Tuscan Inn deal was based on a zero percent financing rate, he would not have needed to rely on the MARP lease rate. *Id*. At the conclusion of the meeting, Abdel left. *Id*. However, he returned after several minutes, denying he had altered the MARP and demanding that Dominguez give him her interview notes. *Id*. at 16. Dominguez states that based on Abdel's conduct and statements during the interview, she concluded that Abdel had altered the MARP. *Id*., ¶ 17. She further states that Aronson expressed to her that he also believed Abdel had falsified the MARP. *Id*.

Dominguez also interviewed Therese Demers. *Id*., ¶ 18. According to Dominguez, Demers told her that the altered MARP was included in the Tuscan Inn deal that Abdel had submitted to her,

8

but that she didn't pay attention to it because Abdel was not using the MARP leasing rate but instead was using zero percent financing. *Id*. When asked whether or not someone other than the sales representative could put something into an order package, Demers stated that this was theoretically possible, but she was not aware of this happening. *Id*. Demers stated that the only person she could imagine touching a deal on her desk was the sales representative and the O/C. *Id*.

Dominguez interviewed Martinez as well. Dominguez's account of her interview with Martinez is consistent with Martinez's own deposition testimony, described above, as to how she came upon the MARP and ultimately discovered that it had been altered. According to Dominguez, Martinez also rejected the possibility that Abdel might not be using a MARP for the Tuscan Inn deal, stating that Abdel was "definitely trying to use the MARP because not all of the equipment in the deal qualified for zero percent financing." *Id*. In particular, she stated that Abdel was using the MARP lease rate for some equipment included in the Tuscan Inn deal. *Id*.

Ultimately, Dominguez concluded that Abdel was responsible for the altered MARP, in part because she did not find Abdel's denials credible and in part because both Martinez and Demers had confirmed that the altered MARP was included in Abdel's order and had his name on it. *Id*. at ¶ 22. Dominguez states that she "knew of absolutely no reason why anyone other than Mr. Abdel would have any reason to doctor the MARP and put it in *Mr. Abdel's* deal, and not a single witness I interviewed (not even Mr. Abdel) suggested that someone other than Mr. Abdel might have been responsible for the alteration." *Id*. (emphasis in original). Dominguez further concluded that this conduct was a terminable offense under IKON's Code of Ethics. *Id.* at 24. Dominguez also discussed her conclusion with her supervisor, Trina DeWitt, who agreed with Dominguez's recommendation that Abdel be terminated. *Id*., ¶ 25.

Abdel, however, challenges Dominguez's motives in conducting the investigation, suggesting she intentionally ignored evidence that Martinez might have altered the MARP to retaliate against him. He states that Dominguez herself intensely disliked Abdel because he had reported Dominguez to her manager for providing another employee, Anisa Jones, with a false statement of income earnings so that Jones would qualify for low-income housing. Abdel Decl., ¶

9

33. Abdel states that he has reviewed the notes of the August 9 interview and that they are "false and fabricated" and attribute to him things he never said. *Id*., ¶ 34.

Abdel also points to testimony by Therese Demers in her deposition. In particular, Demers testified that after she spoke with Crisi, she talked to Greg Walston, Martinez's supervisor, and told him that she believed Martinez had altered the MARP to get Abdel fired. Plaintiff's Disputed Facts, Ex. C (Demers Depo.) at 100. Demers testified that Walston agreed with her that this was "highly possible," and told Demers that he would talk to Dominguez about it. *Id*. at 100-101. Demers testified that she had not told Dominguez that she thought Martinez was responsible for the altered MARP because she had "to work directly with Yesenia, and . . . [she] was scared of getting her in trouble." *Id*. at 97.

### 6.     The Decision to Terminate Abdel

According to Albrecht, he terminated Abdel based on Dominguez's conclusion that Abdel had altered the MARP in violation of IKON's Code of Ethics. Albrecht Decl., ¶ 5. He states that he did not participate in the investigation or review Dominguez's investigation notes. *Id*. He further states that he "had no reason to believe that Crisi Dominguez was untruthful in reporting her investigatory findings and recommendations to [him]" and "no reason to believe that someone else had altered the MARP found in Plaintiff's deal." *Id*.

Abdel challenges Albrecht's motives, stating that his termination was "pure retaliation for [Abdel's] continued complaints of IKON's illegal conduct which Albrecht refused to stop." Abdel Decl., ¶ 35. He asserts that Albrecht "had to know" that Abdel had complained to Dominguez's manager about her alleged provision of a false income statement to Anisa Jones and, therefore, that Dominguez was biased against Abdel. Plaintiff's Disputed Facts at 8. In addition, he asserts that Albrecht knew Dominguez was biased against Abdel because Albrecht knew Dominguez "had taken steps to improperly destroy the career of another co-employee for which she was disciplined." *Id*. In support of this assertion, Abdel cites Dominguez's deposition testimony that her supervisor in Human Resources, Trina DeWitt, informed her of a complaint against her lodged by an employee whom Dominguez had investigated based on allegations of sexual harassment by another employee. Plaintiff's Disputed Facts, Ex. H (Dominguez Depo.) at 163-173. Finally, Abdel points to testimony

by Cory Harrison that Albrecht told him on August 2, 2004 – the day Harrison was fired – that another senior sales representative would soon be fired. Disputed Facts at 8 & Ex. D at 119-121. According to Abdel, this testimony shows that Albrecht had already made up his mind to terminate before the altered MARP was even discovered, on August 3, 2004.

### 7. The Recorded Telephone Calls

Following his termination, Abdel tape recorded "several" telephone conversations with his former supervisor, Art Aronson, and a telephone conversation with Greg Rudy. Weideman Decl., Ex. A (Abdel Depo.) at 101. Although he testified in his deposition that he recorded "three or four" conversations with Aronson, he states in his declaration that he recorded only three conversations with Aronson. Abdel Decl., ¶ 38. He concedes that he did not tell either Aronson or Rudy that they were being recorded or ask for their consent. *Id*. at 102-103.

Abdel does not dispute that Rudy had no reason to believe his conversation with Abdel was being recorded or overheard. Plaintiff's Disputed Facts at 12. On the other hand, he asserts that Aronson had no expectation the recorded conversations would be confidential. *Id*. at 11-12. He points out that Aronson took all three of the calls that Abdel recorded on his speaker phone and that during each of these calls, Abdel could hear other people in Aronson's office "asking him questions and conducting business." Abdel Decl., ¶ 39. In addition, Abdel cites testimony by IKON employees Matt Clement and Kim Blodgett that each was present in Aronson's office during a telephone conversation between Aronson and Abdel and heard the entire conversations on the speaker phone. *See* Plaintiff's Disputed Facts, Ex. E (Blodgett Depo.) at 163-164; Ex. F (Declaration of Matt Clement in Support of Opposition to IKON's Motion for Summary Judgment ("Clement Decl.")), ¶ 5. Finally, Clement states that Aronson "kept the door to his office open" and that "[h]is habit was to use his speaker phone to take phone calls." *Id*., Ex. F (Clement Decl.), ¶ 4.

### B. Procedural Background

Plaintiff filed this action on January 18, 2005, in California state court. He asserts the following claims: 1) violation of California Labor Code §§ 1102.5(c) and (d), prohibiting retaliation for reporting to a government entity or law enforcement agency something an employee believes to be illegal or refusing to participate in an illegal activity ("the Whistleblower Claim"); 2) wrongful

11

termination in violation of public policy based on the same statutory provisions as the Whistleblower Claim ("the Public Policy Claim"); and 3) violation of California Labor Code §§ 200-201, 210 and 216 based on IKON's alleged failure to pay wages and commissions due Abdel upon his termination ("the Wage Claim"). Plaintiff seeks a variety of damages, including general and punitive damages.

On March 4, 2005, IKON filed a Cross-Complaint against Abdel asserting he violated the California Invasion of Privacy Act, Cal. Penal Code §§ 632 *et seq.*, when he recorded telephone conversations with Aronson and Rudy ("the Invasion of Privacy Claim"). On the same day, IKON removed the action to this Court on the basis of diversity jurisdiction.

### C.     The Motion

In the Motion, IKON asserts that it is entitled to summary judgment on the following grounds: 1) Abdel's Whistleblower and Public Policy Claims fail because IKON has demonstrated that it had a legitimate non-discriminatory reason for terminating him and Abdel has not made an adequate showing of pretext; 2) Abdel is not entitled to punitive damages because, as a matter of law, no officer, director or managing agent of IKON has engaged in any fraudulent, oppressive, or malicious conduct against Abdel or ratified or authorized any wrongful conduct; and 3) IKON has established, as a matter of law, that Abdel violated the Invasion of Privacy Act based on the undisputed evidence that he secretly recorded conversations with Aronson and Rudy.

In his Opposition, Abdel asserts that he has presented sufficient evidence of pretext to survive summary judgment as to his Whistleblower and Public Policy Claims. With respect to his request for punitive damages, Abdel points to evidence that some of the alleged wrongful conduct was committed by Albrecht, who is an officer of IKON. Finally, while Abdel essentially concedes that IKON is entitled to summary judgment on the Invasion of Privacy Claim as to the conversation with Rudy, he argues that summary judgment is not warranted as to the Aronson conversations because Penal Code § 632(c) applies only where the individual being recorded does not "reasonably expect that the communication may be overheard or recorded."[4]

---

[4] Defendant filed Objections to Deposition Testimony Submitted by Plaintiff in Opposition to Motion for Partial Summary Judgment ("Defendant's Objections"). To the extent these objections relate to evidence the Court relies on in its ruling, these objections are addressed below.

12

**III.     ANALYSIS**

    **A.     Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986).

    **B.     Evidence of Pretext**

IKON asserts that it is entitled to summary judgment on both the Whistleblower Claim and the Public Policy Claim because it has presented evidence that IKON terminated Abdel for a legitimate, non-discriminatory reason, and Abdel has not presented sufficient evidence of pretext to give rise to a genuine issue of material fact. The Court agrees.

Abdel's Whistleblower and Public Policy Claims are based on the assertion that IKON terminated Abdel in retaliation for his complaints to the California Labor Commission as well as his other complaints about conduct he believed to be illegal. For both of these claims, California courts apply the burden-shifting approach articulated by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, to establish a prima facie case of retaliation, Abdel must

demonstrate that: 1) he engaged in protected activity; 2) that his employer subjected him to an adverse employment action; and 3) there was a causal link between the protected activity and the adverse employment action. *Patten v. Grant Joint Union High School Dist.*, 134 Cal. App. 4th 1378, 1384 (2005) (Cal. Labor Code § 1102.5); *Colarossi v. Coty US Inc.*, 97 Cal. App. 4th 1102, 1152 (2002) (wrongful termination in violation of public policy). Once the plaintiff has established a prima facie case, the employer is required to offer a legitimate, non-discriminatory reason for the adverse employment action. *Patten*, 134 Cal. App. 4th at 1384; *Colarossi*, 97 Cal. App. 4th at 1152. The burden then shifts back to the plaintiff to show that the explanation given by the employer for the adverse employment action is "mere pretext." *Patten*, 134 Cal. App. 4th at 1384; *Colarossi*, 97 Cal. App. 4th at 1152.

Where a plaintiff has established a prima facie case of discrimination and the employer has, in turn, articulated a legitimate non-discriminatory reason for the action, the plaintiff can survive summary judgment only if he produces "specific, substantial evidence of pretext" showing that there remains a genuine factual issue for trial. *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994)). "This burden is hardly an onerous one: the plaintiff who has established a prima facie case need produce very little evidence of discriminatory motive to raise a genuine issue of fact as to pretext." *Id.* (citations omitted). On the other hand, "[i]t is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound." *Hersant v. Dep't of Soc. Servs.*, 57 Cal. App. 4th 997, 1005 (1997). The court in *Hersant* explained:

> The employee cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, . . . and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Id*. (quoting *Fuentes v. Perskie*, 32 F.3d 759,765 (3d Cir. 1996) (citations omitted)).[5]

Here, IKON has conceded for the purposes of the Motion that Abdel has established a prima facie case of retaliation. IKON, in turn, has proffered a legitimate non-discriminatory reason for Plaintiff's termination: that Plaintiff had altered a MARP. Thus, the Court must resolve whether Abdel has produced sufficient evidence of pretext to show a genuine issue of material fact for trial. In support of his assertion that IKON's stated reason for terminating him is pretext, Abdel points to evidence that he contends shows that: 1) Dominguez, because of her own animosity toward Abdel, conducted a flawed investigation, intentionally disregarding the lack of direct proof that Abdel falsified the MARP and ignoring evidence that Martinez might have altered the MARP; 2) Albrecht followed Dominguez's recommendation, even though he "had to know" that Dominguez was biased against Abdel, *see* Plaintiff's Disputed Facts at 8; and 3) Albrecht had decided to terminate Abdel before the altered MARP was even discovered, telling Harrison on August 2 that another senior sales representative would soon be fired..

Although Abdel has presented evidence that might create fact questions about the motivations of Martinez and/or Dominguez, he has not shown that there is a genuine issue of material fact relating to whether Albrecht's decision to terminate Abdel was in retaliation for his complaints.

First, there is no evidence in the record from which a fact finder could reasonably conclude that Albrecht, who ultimately made the decision to terminate Abdel, knew that Dominguez might

---

[5] In his Opposition, Abdel cites to Labor Code § 1102.6, suggesting that IKON's burden on summary judgment is to produce "clear and convincing evidence" that the Abdel would have been terminated even if he had not engaged in protected activity. Section 1102.6 provides as follows:

> In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.

Cal. Labor Code § 1102.6. The Court concludes that this provision does not alter the analysis of pretext at the summary judgment stage in cases involving § 1102.5. *See, e.g., Patten v. Grant Joint Union High School Dist.*, 134 Cal. App. 4th 1378, 1384 (2005).

have had a reason to be biased against Abdel. Although Abdel states in his Disputed Facts that Albrecht "had to know" that Abdel had complained to Dominguez's manager about her alleged provision of a false income statement to Anisa Jones, there is no evidence in the record that this is so. Abdel states in his own declaration only that he reported Dominguez to her manager. Abdel Decl., ¶ 33. Testimony by Harrison indicates that Dominguez's manager was at that time acting Human Resources Director John Hawkins. Plaintiff's Disputed Facts, Ex. D (Harrison Depo.) at 13. But there is no testimony by Abdel, Albrecht or anyone else indicating that Albrecht was ever told about Abdel's complaint about Dominguez.

Nor is the Court persuaded by Abdel's assertion that Albrecht was aware of Dominguez's bias because he "had to know that she had taken steps to improperly destroy the career of another co-employee for which she was disciplined." Plaintiff's Disputed Facts at 8. In support of this assertion, Abdel cites Dominguez's deposition testimony that her supervisor in Human Resources, Trina DeWitt, informed her of a complaint against her lodged by an employee whom Dominguez had investigated based on allegations of sexual harassment by another employee. Plaintiff's Disputed Facts, Ex. H (Dominguez Depo.) at 163-173. Abdel's reliance on this testimony to show pretext fails for several reasons. First, although Dominguez initially stated that she had been disciplined, she immediately clarified that there had been no disciplinary action against her and that she was merely informed of the complaint. No reasonable fact finder could read this testimony otherwise. Second, there is no evidence in the record that Albrecht was informed of the complaint by Trina DeWitt or anyone else. Third, even if he had been informed, there is no evidence in the record that Abdel had anything to do with this incident and, therefore, Albrecht would have had no basis to conclude that it indicated bias on Dominguez's part towards Abdel.

Second, there is no evidence in the record that anyone ever suggested to Albrecht – or even Dominguez – that the altered MARP might have been inserted into Abdel's deal by Martinez (or anyone else). In particular, while Demers testified that she raised this possibility with her supervisor, Greg Walston, and said that Walston told her he would talk to Dominguez, *see* Plaintiff's

16

Disputed Facts, Ex. C (Demers Depo.) at 100-101,[6] there is no evidence in the record that Walston spoke to Dominguez or Albrecht (or anyone else involved in making the decision).

Third, Payne's statements to Abdel that he might "find [himself] not working [at IKON] anymore" if he didn't "do something with it or shut up," *see* Plaintiff's Disputed Facts, Ex. B (Payne Depo.) at 26, do not provide evidence of retaliatory intent. Those statements were made by Payne in conversations with Abdel long after he had any supervisory authority over Abdel, when he worked in an entirely different office, in the Central Valley. Although Payne says that he told his own supervisor, Ken Griffith, about Abdel's complaints, *see id.* at 25,[7] there is no evidence in the record that either Payne or Griffith were in any way involved in the decision to terminate Abdel.

Fourth, the reference to Abdel's "negativity" in Jim Fuller's April 5, 2004 warning letter do not raise a fact question regarding pretext because there is no evidence that Fuller had any involvement in the decision to terminate Abdel.

Fifth, Abdel's and Harrison's assertions that IKON "blacklisted" employees who went to the Labor Commission is not supported by the kind of specific and substantial evidence that would allow the Court to find a fact question on pretext. In particular, Abdel has not provided any specific information about the complaints – when they were brought, what they involved, and who brought them – or the employment histories of the individuals involved. Indeed, Abdel has not provided any documentation of his own complaints or how they were resolved. Nor has Abdel provided any evidence regarding the stated reasons for these employees' termination or evidence that these reasons were pretext.[8]

---

[6] In addition, the Court sustains Defendant's objection to Demers' testimony on the basis that Walston's statements to Demers are inadmissible hearsay. *See* Objections at 2:25-26. Therefore, the Court rejects Plaintiff's reliance on this evidence on that basis as well.

[7] Defendant objects to this testimony as containing hearsay, improper opinion and as lacking personal knowledge. The Court overrules these objections because it relies on this testimony only as evidence that Payne told Griffith about his conversations with Abdel.

[8] In addition, the Court sustains Defendant's objections to Harrison's deposition testimony that a number of former IKON employees were "blacklisted." *See* Objections at 3:22-23. There is no indication that Harrison had any personal knowledge of the reasons for these employees' termination.

17

Sixth, Harrison's testimony that he was told at the time he was terminated – about a week before Abdel's termination – that another employee was going to be fired, *see* Plaintiff's Disputed Facts, Ex. D (Harrison Depo.) at 15, 119-121,[9] is not sufficiently specific and probative to show that Albrecht had already decided to terminate *Abdel*. Contrary to the representation made in Plaintiff's briefs that Harrison testified Albrecht told him that another employee would soon be fired for the same reason Harrison was being fired, namely, forging of documents, Harrison actually testified that Albrecht said only that someone else was going to be fired soon. *See id.* Harrison made clear in his deposition that Albrecht did not state who was going to be terminated or the reason for that individual's future termination. The bare statement that someone was going to be terminated is not sufficient to create a material issue of fact as to pretext.

Thus, the Court is left with evidence that Abdel did, in fact, complain about a number of practices he considered to be illegal – often to Albrecht. The Court concludes that this evidence, by itself, is not sufficient to create a fact question as to pretext. If it were, any Plaintiff who engaged in protected activity and subsequently was terminated would be able to survive summary judgment, thus rendering the burden-shifting framework meaningless.

Therefore, the Court concludes that IKON is entitled to summary judgment on Abdel's Whistleblower and Public Policy Claims.

**C.     Availability of Punitive Damages**

In his complaint, Abdel alleges that he is entitled to punitive damages on his Whistleblower and Public Policy Claims. He does not expressly seek punitive damages on his Wage Claim but rather, seeks statutory penalties under Labor Code § 210. Thus, to the extent the Court has concluded that IKON is entitled to summary judgment on the Whistleblower and Public Policy Claims, the Court need not reach this issue.

---

[9] Defendant objects to this testimony on the basis that it was given in response to a leading question. The objection is overruled.

18

### D. Invasion of Privacy Claim

IKON asserts that it is entitled to summary judgment on its Invasion of Privacy Claim under California Penal Code § 632. That section imposes monetary penalties where an individual "intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device . . records the confidential communication." Cal. Penal Code § 632(a). The word "confidential" is defined as follows:

> The term "confidential communication" includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto,
>
> but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

Cal. Penal Code § 632(c).

Abdel testified that he recorded a conversation with Rudy without Rudy's knowledge. Weideman Decl., Ex. A (Abdel Depo.) at 101. He also concedes that Rudy had no reason to believe his conversation with Abdel was being recorded or overheard. Plaintiff's Disputed Facts at 12. This undisputed evidence would allow a fact finder to conclude that Abdel violated Penal Code § 632(a) with respect to the Rudy telephone call. Therefore, IKON is entitled to summary judgment to the extent the Invasion of Privacy Claim is based on that call.

In contrast, Abdel has presented evidence that Aronson customarily took his calls on speaker phone, left his door open, and often conducted telephone conversations while others were in his office. Abdel has also presented evidence that during the telephone calls with Aronson that he recorded, there were, in fact, other people in Aronson's office. This evidence is sufficient to create a fact question as to whether Aronson had a reasonable expectation that the conversations would be overheard. Accordingly, IKON is not entitled to summary judgment on that aspect of the Invasion of Privacy Claim.

## IV. CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part as follows: summary judgment is GRANTED as to Plaintiff's Whistleblower Claim (Claim One) and his Public Policy Claim (Claim Two), which are dismissed with prejudice; summary judgment also is GRANTED as to IKON's counterclaim for Invasion of Privacy to the extent that claim is based on Plaintiff's recording of a conversation with Greg Rudy. Summary judgment is DENIED as to IKON's counterclaim for Invasion of Privacy to the extent that claim is based on Plaintiff's recording of conversations with Art Aronson.

IT IS SO ORDERED.

Dated: August 25, 2006

_____
JOSEPH C. SPERO
United States Magistrate Judge